U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GREAT AMERICA PAC<br>107 S. West Street, Suite 555<br>Alexandria, VA 22314,<br><br>     *Plaintiff*,<br><br>  v.<br><br>FEDERAL ELECTION COMMISSION,<br>999 E Street, NW<br>Washington, DC 20463,<br><br>     *Defendant*, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**VERIFIED COMPLAINT**

Plaintiff GREAT AMERICA PAC brings this action for injunctive and declaratory relief and alleges as follows:

1. This lawsuit seeks to compel the Federal Election Commission ("FEC") to take action on an administrative complaint Great America PAC ("GAP") filed with the FEC over three years ago. GAP's complaint challenges billionaire Michael Bloomberg's unprecedented violation of campaign finance law in which he laundered over $18 million of his personal funds through his short-lived presidential campaign account to the DNC—effectively contributing over 500 times the legal limit to a national political party committee and quite possibly tipping the balance of the 2020 presidential election.

2. Despite the fact Bloomberg has publicly admitted the material facts of his illegal scheme, the FEC has remained characteristically inert for the past three years, failing to initiate enforcement action against Bloomberg or the DNC.

1

3. In light of the magnitude of Bloomberg's scheme to flout federal campaign finance law to illegally funnel millions of dollars to the DNC, this Court must ensure the FEC takes appropriate enforcement action in a timely manner pursuant to 52 U.S.C. § 30109(a)(8). In particular, the FEC's failure to find probable cause federal campaign finance law has been violated, despite the clear evidence set forth in GAP's administrative complaint and Bloomberg's own public admissions is arbitrary, capricious, and contrary to law.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201, because it arises under a federal statute and seeks, in part, declaratory relief.

5. Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendant is an entity of the U.S. Government.

## PARTIES

6. Plaintiff GREAT AMERICA PAC ("GAP") is an unauthorized, non-connected *Carey*[1] PAC headquartered in Alexandria, Virginia.

7. Defendant FEDERAL ELECTION COMMISSION ("FEC") is the federal agency charged with enforcement of the Federal Election Campaign Act ("FECA") and is located in Washington, D.C.

## THE ADMINISTRATIVE COMPLAINT PROCEDURE

8. 52 U.S.C. § 30109(a)(1) authorizes any person to file a written, signed, sworn, and notarized complaint with the FEC alleging a violation of federal campaign finance law.

9. Within 5 days of receiving the administrative complaint, the FEC must notify "any person alleged in the complaint to have committed such a violation." 52 U.S.C. § 30109(a)(1).

---

[1] *Carey v. FEC*, 791 F. Supp. 2d 121 (D.D.C. 2011).

Any such person "shall have the opportunity to demonstrate, in writing, to the Commission within 15 days after notification that no action should be taken" pursuant to the Complaint, *id*., though the Commission will generally agree to extend this deadline.

10. After the respondents have been given an opportunity to submit a responsive filing, the Commission must vote on whether "it has reason to believe" a person violated federal campaign finance law. It takes the votes of four Commissioners to approve such a "reason to believe" ("RTB") finding. The RTB vote is based solely on the administrative complaint, any responsive filings, and potentially public FEC records; the Commission is not permitted to undertake any investigation of the complaint or its allegations prior to an RTB finding. *Id*. § 30109(a)(2).

11. Upon making an RTB finding, the Commission must notify the person alleged to have violated the law, and "make an investigation of such alleged violation, which may include a field investigation or audit." *Id*.

12. At the conclusion of the Commission's investigation, OGC must prepare a report setting forth "the legal and factual issues of the case." A copy of the report is provided to each respondent, and they have an opportunity to submit a responsive filing. *Id*. § 30109(a)(3).

13. In most cases, upon receiving OGC's report of the investigation, the Commission must vote whether "probable cause" exists to believe federal campaign finance law was violated. It takes the votes of four Commissioners to make such a probable cause determination. *Id*. § 30109(a)(3), (a)(4)(A)(i).

14. After the Commission makes a probable cause determination, it must attempt to enter into a conciliation agreement with the respondents for a period of 30-90 days. It takes the votes of four Commissioners to approve any such conciliation agreement. *Id*. § 30109(a)(4)(A)(i).

15. If the Commission is unable to reach a conciliation agreement with the respondent, then upon a vote of four Commissioners it may seek monetary or injunctive relief in U.S. District Court. *Id*. § 30109(a)(6)(A).

## THE FEC'S FAILURE TO TAKE ACTION ON GAP'S ADMINISTRATIVE COMPLAINT

16. On March 24, 2020 - well over three years ago - GAP filed an administrative complaint with the FEC against Michael Bloomberg; his authorized candidate committee, Mike Bloomberg 2020, Inc. ("MB2020"); and DNC Services Corp./Democratic National Committee ("DNC").

17. The administrative complaint was written, signed, notarized and verified under penalty of perjury as required by 52 U.S.C. § 30109(a)(1). Exhibit 1 to the administrative complaint was a copy of a memorandum from MB2020 to DNC Chair Tom Perez.

18. A true and complete copy of GAP's administrative complaint and accompanying exhibit is appended to this Complaint as Exhibit 1.

19. On March 26, 2020, the FEC acknowledged it had received the administrative complaint on March 24. A true and complete copy of the FEC's acknowledgement is attached to this Complaint as Exhibit 2.

20. On or about March 26, 2020, the Enforcement Division of the FEC's Office of General Counsel ("OGC") assigned Matter Under Review ("MUR") number 7722 to the Administrative Complaint.

21. On information and belief, the FEC notified the respondents of the Administrative Complaint within five days of its receipt, pursuant to 11 C.F.R. § 111.5(a), and provided them with an opportunity to submit a response within 15 days, pursuant to 11 C.F.R. § 111.6(a). On

information and belief, the Commission has not yet held a vote to determine whether "probable cause" exists Respondents violated federal law.

## THE ALLEGATIONS IN GAP'S ADMINISTRATIVE COMPLAINT

22. The administrative complaint GAP filed with the FEC alleges the existence of a conspiracy to funnel—effectively launder—well over $18 million of Michael Bloomberg's personal funds through his abortive presidential candidate committee to the DNC.

23. The administrative complaint alleges, based on MB2020's publicly available campaign finance disclosure reports, Michael Bloomberg transferred more than $935,000,000 of his personal funds to MB2020 from late 2019 through February 2020. He transferred additional personal funds to MB2020 after that date, as well. *Administrative Complaint*, Exh. 1, ¶¶ 6, 8. The administrative complaint further explained Bloomberg was effectively the sole source of funding for MB2020. *Id*. ¶ 7.

24. The administrative complaint notes on or about March 4, 2020, Bloomberg suspended his campaign for the Democratic nomination for President after winning only 58 out of 3,979 pledged delegates to the 2020 Democratic National Convention. *Id*. ¶¶ 9-10.

25. The administrative complaint detailed a memo MB2020 issued to DNC Chair Tom Perez shortly after Bloomberg dropped out of the Presidential race. *Id*. ¶ 11. The Memo stated MB2020 was transferring $18 million of the funds it had received from Bloomberg to the DNC to "dramatically expand the DNC's Battleground Build-Up 2020 efforts across battleground states, drawing in part from [MB2020's] own incredibly experienced and talented organizing staff." *Id*. ¶ 15, 20. The Memo further declared MB2020 "will also transfer several of its former field offices to state parties and help accelerate the hiring pace for important positions in organizing, data, and operations across key battleground states." *Id*. ¶ 17.

26. The administrative complaint explained Bloomberg controlled the personal funds he had transferred to MB2020, even while they were in that authorized candidate committee's account and could have refunded the money to his personal account at any time. *Id*. ¶¶ 15, 19, 27.

27. The administrative complaint declared:

Under the unique circumstances of this case, where BLOOMBERG is the source of all the funds in [MB2020's] account; BLOOMBERG controls the funds in that account; and [BLOOMBERG] may completely refund to his personal account all of those funds at any time, a contribution from [MB2020] to the DNC must be treated as a contribution from BLOOMBERG himself to the DNC. Allowing BLOOMBERG to contribute $18 million of his own funds to the DNC by laundering them through his now-defunct presidential campaign account would facilitate circumvention of the Federal Election Campaign Act's ("FECA") contribution limits.

*Id*. ¶ 28-29.

## THE COUNTS IN GAP'S ADMINISTRATIVE COMPLAINT

28. Count I, against Bloomberg, alleged he violated 52 U.S.C. § 30116(a)(1)(B) and 11 C.F.R. § 110.1(c)(1) by making an excessive $18 million contribution of his own personal funds, through MB2020, to the DNC. At the time, those provisions (as adjusted for inflation) permitted an individual to contribute no more than $35,500 annually to the general treasury account of a national political party committee such as the DNC. *See* FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 84 Fed. Reg. 2504 (Feb. 7, 2019). Federal law also allowed a person to contribute a maximum of $106,500 to each of a national political party committee's three special segregated *McCutcheon*[2] accounts. 52 U.S.C. § 30116(a)(1)(B), (a)(9), for a total of $355,000. Because all of MB2020's funds had come from Bloomberg, and Bloomberg had complete and exclusive control over them (including

---

[2] *See McCutcheon v. FEC*, 572 U.S. 185 (2014).

6

the authority to refund that money to his personal account), the transfer from MB2020 to the DNC constitutes a transfer from Bloomberg himself to the DNC.

29. Count II, against the DNC, alleged it violated 52 U.S.C. § 30116(a)(1)(B), (f), and 11 C.F.R. §§ 110.1(c)(1)(i), 110.9, by receiving the illegal excessive contribution of $18 million from Bloomberg.

30. Count III, against Bloomberg, MB2020, and the DNC, alleged they violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b)(i), (iv), by illegally making and receiving contributions made in the name of another. Bloomberg contributed his personal funds, over which he had complete and exclusive control, from MB2020's account to the DNC, while reporting the transaction as a transfer from MB2020 to the DNC. By using MB2020 as a vehicle through which to contribute his personal funds to the DNC, Bloomberg made a contribution in the name of another.

31. Count IV, against Bloomberg, alleged he violated 52 U.S.C. § 30116(a)(1)(D) and 11 C.F.R. § 110.1(c)(5) by making an excessive in-kind contribution to state political party committees in "key battleground states." At the time, federal law permitted an individual to contribute no more than $10,000 annually to a state political party committee. MB2020 nevertheless transferred several "former field offices to state parties and help accelerate the hiring pace for important positionks in organizing, data, and operations across key battlegrounds states." Those field offices had been paid for exclusively with Bloomberg's personal funds which he had transferred to MB2020, and Bloomberg retained complete and exclusive control over those offices. The transfers should be treated as excessive and illegal in-kind contributions from Bloomberg to the state party recipients.

32. Count V, against MB2020, alleged—in the alternative to Counts I through IV, in the event the Commission rejected them—MB2020 violated 52 U.S.C. §§ 30114(a)(4), 30116(a)(1)(B), and 11 C.F.R. §§ 110.1(c)(1), 113.2(c), by making an illegal excessive contribution to the DNC. Federal law specifies "[a] contribution accepted by a candidate . . . may be used by a candidate . . . for transfers, without limitation, to a national, State, or local committee of a political party." 52 U.S.C. § 30114(a)(4); 11 C.F.R. § 113.2(c). A candidate's expenditures of his or her personal funds, including contributions to his or her campaign account, do not qualify as "a contribution accepted by a candidate" for purposes of those provisions. Thus, Bloomberg did not "accept" any contributions that fell within those special "unlimited transfer" provisions. The personal funds Bloomberg transferred to his campaign account were subject to the ordinary limits on contributions from a political committee to a national political party committee of $35,500 annually to the general account and $106,500 to each of the three special segregated *McCutcheon* accounts. 52 U.S.C. § 30116(a)(1)(B), (a)(9); 11 C.F.R. § 110.1(c)(1); 84 Fed. Reg. at 2504.

33. Count VI, against the DNC, alleged—in the alternative to Counts I through IV, in the event the Commission rejected them—the DNC violated 52 U.S.C. § 30116(a)(1)(B), (f), and 11 C.F.R. §§ 110.1(c)(1)(i), 110.9, by receiving the illegal excessive contribution of $18 million from MB2020.

**THE CONSEQUENCES OF THE FEC'S FAILURE TO ACT**

34. The FEC's failure to act on GAP's administrative complaint in over three years has violated GAP's rights under 52 U.S.C. § 30109(8)(A).

35. The FEC's failure to act on GAP's administrative complaint placed GAP at a competitive disadvantage relative to the DNC. During the 2020 election cycle, GAP devoted itself to making expenditures and engaging in a range of political activities opposing the Democratic

8

candidate for President who Bloomberg, MB2020, and the DNC were promoting, and supporting the Republican candidate, President Donald J. Trump.

    a.    GAP had complied with campaign finance restrictions in promoting the 2020 Republican candidate and opposing the Democratic candidate for President.

    b.    In the 2020 election cycle, the DNC was able to unfairly oppose, dilute, and undermine GAP's efforts by funding the Democratic candidate with illegally excessive contributions, placing GAP at a strategic and competitive disadvantage.

    c.    GAP intends to again expend substantial time, effort, and resources in opposing the Democratic candidate for President in the 2024 election who the DNC will be publicly aiding and in support of whom the DNC will be making substantial expenditures. To the extent the DNC was never forced to disgorge $18 million – nearly 4% of the gross funds raised by the DNC in that cycle - to reflect the illegal excessive contributions it received, is allowed to engage in massive violations of campaign finance law without consequence, and continues to operate free of any injunction barring it from continuing to violate federal campaign finance law, GAP will remain at a competitive disadvantage in its political efforts concerning the 2024 presidential election and face an unlevel playing field.

36.    The FEC's failure to act on GAP's administrative complaint hindered GAP's organizational interests by allowing the DNC to spend up to an additional $18 million in illegally obtained funds in opposition to GAP's message in support of Republican presidential candidates, and potentially unlimited amounts in the future through similar illegal conspiracies.

37.    The FEC's failure to act on GAP's administrative complaint has harmed GAP by undermining one of GAP's primary missions of facilitating free and fair elections held in

compliance with applicable legal requirements such as the FECA. *See Campaign Legal Ctr. v. FEC*, 466 F. Supp. 3d 141 (D.D.C. 2020).

38. GAP seeks information which must be publicly disclosed pursuant to a statute, It has not received information which the respondents who were identified in its administrative complaint were required to publicly disclose. The FECA requires the disclosure of the information GAP seeks, and there is no reason to doubt the information would help GAP. *See Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2000) (per curiam).

39. GAP requires the information it seeks to be able to know, and disclose to the public, whether the contributions at issue to the DNC and state parties were made by Bloomberg himself or instead MB2020. This information – whether a billionaire personally and unlawfully tilted the outcome of a presidential election – will remain unavailable to GAP (at least via FECA disclosure) without a favorable ruling in this case.

40. GAP has used a combination of research, litigation, advocacy, and public education through its website to disseminate information to the public about candidates, officials, and their actions. GAP's work on campaign finance-related issues, including public education through its website, litigation, and administrative proceedings depends on accurate campaign finance reports as required by statute. *See Campaign Legal Ctr. v. FEC*, No. 20-0809 (ABJ), 2021 U.S. Dist. LEXIS 215687, at *11 (D.D.C. Nov. 8, 2021). It is hindered in those core programmatic activities when those individuals are able to keep their actions hidden. *See Citizens for Responsibility & Ethics v. FEC*, 243 F. Supp. 3d 91, 102 n.5 (D.D.C. 2017). GAP has concrete plans to disseminate through its website, and to its email list, information concerning Bloomberg, MB2020, the DNC, and state parties it obtains as a result of this lawsuit.

## COUNT I – FAILURE TO ACT UNDER 52 U.S.C. § 30109(8)(A)

41.GAP hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1 to 39 as if fully set forth herein.

42.GAP filed its Administrative Complaint alleging violations of federal campaign finance law with the FEC on March 24, 2020.

43.Over 120 days have elapsed since GAP filed its administrative complaint, and the FEC has failed to act. In particular, on information and belief, the FEC has not voted on whether to pursue civil litigation based on the administrative complaint.

44.GAP is aggrieved by the Commissions' failure to act on its Administrative Complaint. 52 U.S.C. § 30109(a)(8)(A) provides, "Any party aggrieved . . . by a failure of the Commission to act" on an Administrative Complaint "during the 120-day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia." The Court may rule the Commission's "failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days."

45.The Commission's failure to act on GAP's Administrative Complaint is arbitrary, capricious, contrary to law, and an abuse of discretion.

WHEREFORE, Plaintiff GAP is entitled to relief under 52 U.S.C. § 30109(a)(8).

**PRAYER FOR RELIEF**

Plaintiff GAP prays for the following relief:

1. A declaratory judgment GAP is entitled to relief under 52 U.S.C. § 30109(a)(8)(A), (C) and the FEC's failure to act on its administrative complaint is arbitrary, capricious, contrary to law, or an abuse of discretion.

2. An injunction compelling the Commission, pursuant to 52 U.S.C. § 30109(a)(8)(C), to vote no more than thirty (30) days from the date of this Court's order on such matters as this Court deems appropriate, including but not limited to whether:

   a. reason to believe exists one or more respondents to the administrative complaint violated federal law;

   b. probable cause exists to believe one or more respondents violated federal law; and/or

   c. to initiate civil proceedings in connection with the administrative complaint.

3. Costs and attorneys' fees pursuant to any applicable statute or authority, including but not limited to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4. Such other relief as this Court deems just and appropriate.

Dated April 12, 2023

Respectfully submitted,

/s/ Dan Backer

Dan Backer, Esq. (D.C. Bar # 996641)
CHALMERS, ADAMS, BACKER & KAUFMAN LLC
441 N. Lee Street, Suite 300
Alexandria, VA 22314
(202) 210-5431 (telephone)
(202) 478-0750 (facsimile)
dbacker@chalmersadams.com
*Counsel for Plaintiff Great America PAC*

## VERIFICATION

I, Dan Backer, declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge. Executed on April 12, 2023.

/s/ Dan B.

COMPLETED BEFORE A NOTARY PUBLIC

State of Florida

City of Lighthouse Point

County of Broward

Subscribed and sworn to before me on this 12 day of April, 2023.

My Commission expires on 02/01/2027.

Isabel Sanchez
Comm.: HH 356925
Expires: February 1, 2027
Notary Public - State of Florida

13